IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 SEP -6 AM 8: 13

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

| | | |
|---|---|---|
| INVENTORY LOCATOR SERVICE, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff/ | ) | |
| Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 02-2695 Ma/V |
| | ) | |
| PARTSBASE, INC., | ) | |
| | ) | |
| Defendant/Counter-Claimant. | ) | |

## ORDER ON PENDING MOTIONS

This action arises from the Defendant's alleged unlawful access of the computerized database of Plaintiff Inventory Locator Service, LLC ("ILS"). Defendant Partsbase, Inc. ("Partsbase") has brought counterclaims, alleging similar conduct on the part of ILS. Before the court are the following motions: 1) ILS's October 19, 2004 motion to dismiss Counts II, VI, VII, and VIII of the amended counterclaim, 2) Partsbase's January 31, 2005 motion for partial summary judgment dismissing ILS's lost profits damage claim, 3) Partsbase's January 31, 2005 motion in limine to exclude the Slater Damage Report from evidence, 4) Partsbase's January 31, 2005 motion in limine to "exclude certain records of ILS which do not meet the requirements of F.R.E. 803, 805, and 403," 5) Partsbase's January 31, 2005 motion for partial summary judgment dismissing ILS's claim under 18 U.S.C. § 2701 (Count IV), 6) Partsbase's January 31, 2005

motion for summary judgment dismissing Count III, 7) Partsbase's January 31, 3005 motion for partial summary judgment eliminating claims from ILS's asserted damages due to the statute of limitations and "non-customers," and due to lack of proof of causation, 8) ILS's January 31, 3005 motion for partial summary judgment, 9) Partsbase's January 31, 2005 motion in limine to exclude certain ILS records and references to certain actions between ILS and the Partsbase Division of Aviation Laboratories, Inc., 10) the parties' joint motion to establish a deadline for pretrial motions, filed on February 14, 2005, 11) ILS's March 2, 2005 motion to strike evidence used in support of Partsbase's motion for summary judgment, 12) Partsbase's March 4, 2005 motion concerning the legal status of the ILS supplier directory and the ILS database, 13) ILS's June 20, 2005 motion[1] to dismiss Partsbase's counterclaims due to spoliation of evidence, and 14) ILS's July 6, 2005 supplemental motion for partial summary judgment.

The record indicates that each of these motions has received a timely response from the opposing party. As a preliminary matter, the court held a status conference on March 9, 2005, in which it granted Partsbase's motion to re-open discovery and postponed the trial date until September 19, 2005. The court also

---

[1] This motion has been referred to the magistrate judge for a report and recommendation. It will not, therefore, be addressed in this order.

established a deadline for pretrial motions of July 11, 2005. Partsbase's March 3 emergency motion to re-open discovery and postpone the trial date is, therefore, DENIED as moot. The parties' joint motion to establish a deadline for pretrial motions is also DENIED as moot.

## I. Background

The following facts are taken from ILS's amended complaint and Partsbase's amended counterclaim. Plaintiff ILS is a Delaware limited liability company with its principal place of business in Memphis, Tennessee. (Am. Compl. ¶ 1.) Defendant Partsbase is a Delaware corporation with its principal place of business in Boca Raton, Florida. (Id. ¶ 2.) ILS operates an "electronic marketplace" for aviation parts, allowing buyers and sellers of airplane parts and equipment to communicate and share information with one another. For these purposes, ILS maintains in Memphis an extensive database of aviation parts that are available for sale. (Id. ¶¶ 5-6.) To protect its database and the customers whose information is stored in that database, ILS allows access only to those who subscribe to its service and agree to the ILS Subscriber Agreement. ILS customers are issued an identification and password that permit access to the protected database. (Id. ¶ 7.) ILS's database provides its subscribers access to information about ILS suppliers and other subscribers, and ILS allows customers to list parts for sale in the database. (Id. ¶ 8.)

Partsbase is a corporation in the same business as ILS. Although smaller in scope, it also maintains a database of available aviation parts. ILS alleges that Partsbase, without authorization, gained access to ILS's database using an identification and password belonging to an ILS customer and used the improperly gained information to solicit ILS customers. (Id. ¶ 10.) ILS alleges that Partsbase has continued to access ILS's database and gather information about ILS customers, using information available only on ILS's database to contact parties listed on the database. (Id. ¶ 11.) ILS claims that customers have complained about Partsbase contacting them soon after they have subscribed to ILS's service. (Id. ¶ 12.) ILS alleges that Partsbase has and continues to use interstate communication to access ILS's database to obtain information about ILS subscribers. (Id. ¶ 13.)

Partsbase maintains a similar database of aviation parts and services available for sale. Partsbase has had, since its inception, access to a large database of potential customers in the aviation industry because of its prior affiliation with Aviation Labs, Inc., and Partsbase has spent millions of dollars developing its customer base. (Am. Counterclaim ¶ 6.) Partsbase allows access to its airplane parts and service database only to those customers who subscribe to and pay for its services and agree to the terms and conditions of the Partsbase subscriber agreement. These

4

Partsbase customers are issued an identification and password that permit access to the database. (Id. ¶ 7.)

There are four levels of Partsbase's website: 1) a "publicly accessible" level, which can be viewed by anyone with internet access, 2) the "airplane parts and service" database, which is only accessible by customers and other persons who use a customer ID and password issued by Partsbase, 3) Partsbase's "internal records and communications" database, which is only accessible to employees of Partsbase, and 4) Partsbase's "internal workings" database, which is only accessible by certain authorized technical employees of Partsbase. Partsbase asserts that the information in levels 2-4 qualifies as a trade secret. (Id. ¶ 8.)

ILS has not been authorized to access any but the publicly accessible level of Partsbase's website. (Id. ¶ 10.) On December 29, 2003, while making a routine assessment of "hits" on a customer's advertisement of its website, Partsbase discovered an internet protocol number ("IP address") assigned to ILS. (Id. ¶ 14.) In January, 2004, using the recently discovered IP address of ILS, Partsbase conducted a preliminary investigation and alleges the following: 1) between October 24, 2001 and early January, 2004, ILS logged into the database of Partsbase on 286 occasions and viewed 6,106 Partsbase customer profiles, 2) ILS used 139 unique Partsbase passwords to log in and view these profiles, 3) the 130 passwords belonged to 119 Partsbase customers in 26 states, and 4)

5

using Partsbase customer identifications and passwords, ILS systematically accessed the entire customer list of Partsbase in alphabetical order. (Id. ¶ 15.)

Partsbase continued its investigation and discovered that a person or persons using the ILS IP address have used over 900 unique passwords belonging to Partsbase customers to access the Partsbase airplane parts and service database. In addition, a person acting from the ILS IP address has made changes in the Partsbase airplane parts and service database. Those changes prevented that database from operating correctly when Partsbase customers attempted to use it. (Id. ¶ 16.) Partsbase alleges that, in order for someone at the ILS IP address to have obtained over 900 Partsbase customer passwords, someone must have unlawfully accessed the fourth level of Partsbase's database, a level which is not accessible merely by use of a Partsbase customer password and is not accessible to most of Partsbase's employees. (Id. ¶ 17.)

Partsbase competes with ILS and has forced ILS to reduce some of its prices. (Id. ¶ 20.) Partsbase alleges that the above actions were part of an attempt to undermine Partsbase's ability to compete with ILS and that ILS has brought and conducted the instant suit in bad faith. (Id. ¶ 21-23.)

## II. Jurisdiction

Plaintiff brings claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Electronic Communications Privacy

6

Act, 18 U.S.C. § 2701; the Defendant brings counterclaims under the same statutes. Thus, the court exercises federal-question jurisdiction under 28 U.S.C. § 1331. The court has jurisdiction over pendant state claims under 28 U.S.C. § 1367.

## III. Legal Standards

### A. Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a plaintiff's complaint "for failure to state a claim upon which relief can be granted." When considering a 12(b)(6) motion to dismiss, a court must treat all of the well-pleaded allegations of the complaint as true, <u>Saylor v. Parker Seal Co.</u>, 975 F.2d 252, 254 (6th Cir. 1992), and must construe all of the allegations in the light most favorable to the plaintiff. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974) (abrogated on other grounds). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984).

### B. Motion for Summary Judgment

The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Kochins v. Linden-Alimak, Inc.</u>,

7

799 F.2d 1128, 1133 (6th Cir. 1986).  The moving party can meet this burden by pointing out to the court that the respondents, having had sufficient opportunity for discovery, have no evidence to support an essential element of their case.  See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  A genuine issue for trial exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The nonmoving party may not oppose a properly supported summary judgment motion by mere reliance on the pleadings.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Instead, the nonmoving party must present "concrete evidence supporting its claims."  Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989).  The district court does not have the duty to search the record for such evidence.  See InterRoyal Corp. v. Sponseller, 889 F.2d 108, 110-11 (6th Cir. 1989).  Nonmovants have the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in their favor.  See id.

## IV. Choice of Law

ILS's amended complaint alleges violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; 18 U.S.C. § 2701; the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. §§ 47-25-1701 et. seq.; and tortious interference with business relations. PartsBase's amended counterclaim alleges identical violations and adds violations of the Florida Uniform Trade Secrets Act, Fla. Stat. Ann. §§ 688.001 et. seq.; the Florida Deceptive and Unfair Trade Practices Act, Fl. St. Ann. §§ 501.201 et. seq.; and the Tennessee Consumer Protection Act, Tenn. Code. Ann. §§ 47-18-101 et. seq. The counterclaim also alleges common law claims for breach of contract, trespass and conversion, and inequitable conduct.

"In federal question cases, a District Court entertaining pendent state claims should follow the choice of law rules of the forum state." Glennon v. Dean Witter Reynolds, Inc., 83 F.3d 132, 136 (6th Cir. 1996). In analyzing tort-based claims, Tennessee applies the "most significant relationship" analysis of the Restatement (Second) of Conflict of Laws. Hataway v. McKinley, 830 S.W.2d 53, 59 (Tenn. 1992). Under the Restatement, "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement

(Second) of the Law of Conflicts  § 145 (1971).[2]

The Restatement allows the court to apply the laws of more than one state to a case, because choice of law is determined with respect to each issue, not to the case as a whole. "Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states." Restatement (Second) of the Law of Conflicts  § 145, comment d.

In determining which state has the most significant interest in the outcome of each issue, the court considers the general principles of § 6 (supra, n.1), along with specific factors listed by § 145:

> Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a)  the place where the injury occurred,

---

[2] Restatement (Second) of the Law of Conflicts, § 6: Choice of Law Principles, states:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

> a. the needs of the interstate and international systems,
> b. the relevant policies of the forum,
> c. the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> d. the protection of justified expectations,
> e. the basic policies underlying the particular field of law,
> f. certainty, predictability, and uniformity of result, and
> g. ease in the determination and application of the law to be applied.

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Hataway, 830 S.W.2d at 59 (quoting Restatement (Second) of Conflict of Laws § 145 (1971)). If the balance of these factors does not clearly point to one state, the Restatement "provides a 'default' rule whereby trial courts can apply the law of the place where the injury occurred when each state has an almost equal relationship to the litigation." Hataway, 830 S.W.2d at 59. Generally, "the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation." Id.

Based on these factors, Tennessee law governs the amended complaint. The alleged injury - Partsbase's intrusion into the ILS database and use of proprietary materials - took place electronically, but the database's physical location was at ILS's principal place of business in Memphis, Tennessee. A person working from a computer located in Boca Raton, Florida allegedly caused this injury. The remaining factors do not weigh in either direction: Partsbase is incorporated in Delaware with its principal place of business in Florida, but ILS is incorporated in Delaware with its principal place of business in Tennessee. "The parties' domicile or residence will 'usually carry little weight of itself'

11

unless all of the parties reside in a single state." <u>Wayland v.</u>
<u>Peters</u>, 1997 WL 776338, at *2 (Tenn. Ct. App. Dec. 17, 1997)
(quoting <u>Restatement (Second) of Conflict of Laws</u> § 145(2), comment
e). There is no relationship between the parties apart from their
common business and this lawsuit. Examining the general principles
of § 6 does not reveal any competing governmental interest that
outweighs Tennessee's interest in applying its law to the alleged
injury.  When the other factors are evenly balanced between two
states, the Tennessee choice-of-law rule requires application of
the law of the state in which the injury occurred.  Thus, Tennessee
law should apply to ILS's claims.

     The same factors indicate that Florida law should apply to the
amended counterclaim.  PartsBase's database is in Florida, and the
alleged intrusion(s) into the database occurred in Florida.   The
conduct allegedly causing this injury occurred in Tennessee, with
all other factors remaining identical.  As a default, the place of
the injury controls unless some other governmental interest is more
important.  <u>Hataway</u>, 830 S.W.2d at 59.  The general principles of
§ 6 do not suggest an overriding Tennessee interest in the
counterclaims.  Instead, § 6 indicates that "the relevant policies
of other interested states and the relative interests of those
states in the determination of the particular issue" as well as
"the basic policies underlying the particular field of law" must be
considered. Restatement (Second), § 6. "The purpose of a duty in
tort is to protect society's interest in being free from harm."
<u>Casa Clara Condominium Ass'n, Inc. v. Charley Toppino & Sons, Inc.</u>,

12

620 So. 2d 1244 (Fla. 1993). "Moreover, forcing tortfeasors to pay for the harm they have wrought provides a proper incentive for reasonable conduct." <u>Clay Elec. Co-op., Inc. v. Johnson</u>, 2003 WL 22966277, at *7 (Fla. Dec. 18, 2003). Florida has a strong interest in protecting its citizens from harm and in regulating the conduct of tortfeasors within its borders. This interest outweighs Tennessee's interest in having its law apply to all torts committed by its citizens, no matter where the injury may have occurred. Further, Tennessee has a lesser interest in protecting the rights of a Florida citizen injured in Florida.

## V. Evidentiary Motions

### A. Motion <u>In</u> <u>Limine</u> to Exclude the Slater Damage Report

Partsbase moves to exclude the expert report of John Slater from evidence. Slater was retained by ILS to give an expert opinion on the issue of damages, particularly the lost profits ILS is alleged to have suffered because of Partsbase's unlawful behavior. Partsbase argues generally that the report is erreneous and speculative.

Although Partsbase contends that the Slater damage report does not meet the standards for admissibility of expert testimony under <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993), Partsbase does not base its arguments on the specific factors announced in that case. Rather, Partsbase argues that the report is unreliable because it makes unfounded factual assumptions and fails to consider important factors relevant to the issue of damages. These arguments go to the report's probative value, not

13

to its admissibility under the Federal Rules of Evidence.

To the extent that Partsbase's arguments are directed to issues of admissibility, those issues involve disputed factual matters and are not ripe for decision. Slater will be allowed to testify at trial about his qualifications to give expert testimony and the methods by which he arrived at his conclusions. If, at that time, Slater's testimony fails to meet the requirements for admissibility, particularly those under Fed. R. Evid. 702-03, Partsbase may renew its objection. For the foregoing reasons, Partsbase's motion is DENIED without prejudice.

### B. Motion In Limine to Exclude ILS Records

Partsbase moves to exclude certain documents from evidence on the basis of hearsay and prejudice. According to Partsbase, the documents at issue fall into two categories: 1) records memorializing statements made by ILS customers indicating that they were switching their accounts to Partsbase and 2) records, used by ILS's expert in generating his report on damages, indicating that ILS customers had been contacted by Partsbase soon after opening accounts with ILS. Partsbase contends that both categories of documents contain multiple levels of hearsay and must, therefore, be excluded from evidence under Fed. R. Evid. 802. ILS argues that the documents are admissible under the exceptions in Fed. R. Evid. 803(3) ("state of mind") and 803(6) ("business records").

A document can qualify under the business record exception to the hearsay rule if it was 1) "made in the course of a regularly conducted business activity, 2) it was kept in the regular course

of business, 3) it was the result of a regular practice of the business to create such documents, and 4) it was made by a person with knowledge of the transaction or from information transmitted by a person with knowledge." U.S. v. Humphrey, 279 F.3d 372, 378 (6th Cir. 2002)(internal quotations omitted).  A witness must lay the requisite foundation to establish that the documents meet the above criteria. Id.

Although Partsbase contends that the documents were created in anticipation of the instant litigation and not as part of a routine business activity, ILS offers evidence to the contrary.  James Sdoia, Vice President of ILS, states that all of the records in question meet the specific requirements of Fed. R. Evid. 803(6). He states that "[p]roviding customer service and having consistent dialogue with existing customers is a regular practice of ILS's business and recording these conversations and keeping them in an organized call report database is a normal practice." (Sdoia Aff. ¶ 3.)  Sdoia's testimony is sufficient to establish a proper foundation for the admission of the documents as business records. U.S. v. Hathaway, 798 F.2d 902, 906 (6th Cir. 1986); U.S. v. Sachs, 801 F.2d 839, 843 (6th Cir. 1986).

Partsbase does not offer specific evidence challenging Sdoia's declarations.  Partsbase argues that, even if the disputed documents qualify as business records, the customer statements contained in them constitute an additional level of hearsay that must be excluded. See Woods v. City of Chicago, 234 F.3d 979, 986 (7th Cir. 2000)("[S]tatements made by third parties in an otherwise

admissible business record cannot be properly admitted for their truth unless they can be shown independently to fall within a recognized hearsay exception."); <u>Wilson v. Zapata Off-Shore Co.</u>, 939 F.2d 260, 271 (5th Cir. 1991); <u>U.S. v. Vigneau</u>, 187 F.3d 70, 75 (1st Cir. 1999). The records at issue contain statements by ILS customers to the effect that they intended to leave ILS to do business with Partsbase or that they had been contacted by Partsbase soon after opening an ILS account. ILS argues, and the court agrees, that the statements of ILS customers about their intent to do business with Partsbase would qualify as statements of their "existing state of mind ... (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" under Fed. R. Evid. 803(3).[3] <u>See, e.g.</u>, <u>Morris Jewelers, Inc. v. General Electric Credit Corp.</u>, 714 F.2d 32 (5th Cir. 1983).

The second category of documents, containing customer statements that they had been contacted by Partsbase, do not fall under the state-of-mind exception and appear to be offered for their truth. Thus, they are inadmissible as part of ILS's case in chief. The documents, however, were also relied on by ILS's damages expert. If the documents are "of a type reasonably relied upon by experts in the particular field in forming opinions or

---

[3] At this stage in the proceedings, there is some question about the relevance of the intention of an individual customer to switch her account to Partsbase. If ILS offers these statements, not to show customer intent, but to show that the customer had been contacted previously by Partsbase, the statements are not being offered for their truth and, therefore, are not hearsay. If the declarations themselves, however, describe facts underlying the customers' respective motives, the statements will not be admitted to prove those facts. <u>See</u> <u>Lewis v. Phillip Morris, Inc.</u>, 355 F.3d 515, 532 n. 26 (6th Cir. 2004).

inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. ...." Fed. R. Evid. 703.   Partsbase has not made any showing that the disputed documents fail to meet this standard.

Partsbase contends further that, even if the documents are admissible under a hearsay exception, they are irrelevant and unduly prejudicial under Fed. R. Evid. 402-03.   The existence of the documents in question makes it more probable that Partsbase unlawfully accessed ILS's customer database.   Therefore, the evidence is relevant. See Fed. R. Evid. 401.   Partsbase has not demonstrated how the documents are unfairly prejudicial.   Thus, the documents are admissible under Fed. R. Evid. 402-03.

For the foregoing reasons, Partsbase's motion is GRANTED to the extent that it seeks to exclude from ILS's case in chief customer statements (Category 2) that they had been contacted previously by Partsbase.   Partsbase's motion is DENIED in all other respects.

### C. Motion to Exclude References to Certain Actions

The following facts are taken from Partsbase's motion, filed January 31, 2005.   Partsbase was originally a division of Aviation Labs, Inc. ("Aviation Labs") and, in 1999, was established as a separate corporation.   In 1998, Aviation Labs was a customer of ILS. As a result of that relationship, Aviation had a copy of the ILS Supplier Directory and access to the ILS database.   When Partsbase was a division of Aviation Labs, it began creating a customer database using the information available to Aviation Labs

17

as a source of customer contact information.   ILS discovered that
Partsbase was obtaining customer information from ILS's database
via Aviation Labs and, consequently, terminated Aviation Labs as a
customer as of October 1, 1998.   ILS's President, Bruce Langsen,
stated that

> the one time we [ILS] threw Aviation Labs off
> of our system was because Partsbase was being
> started and operated in their backrooms and it
> was obvious at that time that they were using
> our database to garner their leads.   ...
> [Partsbase] had acquired a listing of our
> specific customers by name and by phone
> number, and were calling them representing to
> be a competing service and using that
> information to build their own customer count.

(Langsen Depo. 20-23.)   Partsbase seeks to exclude all evidence of
the above incident under Fed. R. Evid. 404(b) and 403.

The foregoing evidence (hereinafter "the 1998 incident") would
appear to be evidence of "other crimes, wrongs, or acts ... to
prove the character of a person [Partsbase] in order to show action
in conformity therewith." Fed. R. Evid. 404(b).   ILS contends,
however, that the evidence is relevant to show Partsbase's "motive,
intent, preparation, plan, knowledge, or absence of mistake or
accident." Id.   In particular, ILS argues that the 1998 incident
shows Partsbase's motive to misappropriate ILS's client
information, demonstrates Partsbase's knowledge of the existence
and content of the relevant database, and undermines Partsbase's
contention that the alleged actions are against company policy.

Partsbase, as a business competitor of ILS, has a motive to
access valuable client information of ILS.   Thus, the disputed

evidence is minimally probative in establishing Partsbase's motive to engage in the alleged conduct. ILS further contends that the 1998 incident is relevant to show that Partsbase knew of its customer database and knew "what kind of information would be present" in the database. Again, there is little doubt that, in order to run its business, ILS would need some kind of comprehensive list of its customers and their contact information. The 1998 incident, therefore, is minimally probative in establishing Partsbase's knowledge about ILS's customer database.[4] Given the significant potential for unfair prejudice, ILS has not shown that the 1998 incident is sufficiently probative as to any issue other than Partsbase's propensity to commit the alleged offenses. Thus, the evidence will be excluded from ILS's case in chief under Fed. R. Evid. 404(b) and 403.

Partsbase does, however, contend that it is innocent of the offenses alleged in part because the use of a competitor's confidential information is against company practice or policy. If a Partsbase witness testifies to that effect, ILS may impeach the witness under Fed. R. Evid. 608 and/or 611(b) with evidence of the 1998 incident. For the foregoing reasons, Partsbase's motion to exclude the evidence of the 1998 incident from ILS's case in chief

---

[4] ILS does not argue that there was a common method or modus operandi that would link the 1998 incident with acts alleged in the instant suit, so as to implicate Partsbase. Nor does ILS show that the 1998 incident gave Partsbase a level of knowledge about ILS's customer database specific enough to link Partsbase to the offenses alleged. The mere contention that Partsbase knew a customer database existed and that it contained customer information is insufficient.

is GRANTED.[5]

### D. Motion to Strike Partsbase's Summary Judgment Evidence

ILS seeks to strike evidentiary materials that Partsbase has attached to various motions for summary judgment. ILS claims that the affidavit of Partsbase attorney E. Gene Thornton is inadmissible under Fed. R. Civ. P. 37(c) and Fed. R. Evid. 701 and 403. ILS also contends that the affidavits of Thornton and Mark Weicher, as well as the exhibits and worksheets (collectively called the "Invoice Evidence") attached to Partsbase's "Motion for Partial Summary Judgment Eliminating Claims from ILS' Asserted Damages Due To The Statutes of Limitations and 'Non-Customers' and Due to no Competent Proof of Causation" should be excluded from evidence under Fed. R. Civ. P. 37 and Fed. R. Evid. 1002.

In its summary judgment motions, Partsbase argues that certain customers left ILS before the alleged events occurred and, therefore, cannot form the basis of ILS's damages claim for lost profits. The Thornton affidavit purports to summarize records produced by ILS that demonstrate when certain customers conducted business with ILS and/or Partsbase. That Thornton has not been disclosed as a fact witness under Fed. R. Civ. P. 26 does not require the exclusion of his affidavit; he is not testifying about his personal knowledge, but merely summarizing documents that have already been produced. Summaries of otherwise admissible records

---

[5] As noted below, Partsbase argues that certain of the instant claims arose from the 1998 incident and are, therefore, barred by the statute of limitations. The court's decision on Partsbase's motion in limine does not preclude Partsbase from offering evidence of the 1998 incident on its own behalf.

or documents may be introduced to aid the court. <u>See</u> Fed. R. Evid. 1006; <u>Martin v. Funtime</u>, 963 F.2d 110, 116 (6th Cir. 1992). ILS has not argued that the records on which the Thornton affidavit is based are inadmissible, nor has it demonstrated that the Thornton affidavit is a misleading or incomplete representation of the underlying materials. Additionally, summaries such as the Thornton affidavit are not "duplicative" and do not violate the "best evidence" rule, Fed. R. Evid. 1002. <u>See</u> <u>id.</u> Thus, ILS has failed to demonstrate why the Thornton affidavit should be stricken from the record.

The Invoice Evidence[6] is also composed of summaries or compilations of other materials. Weicher's affidavit and the exhibits and worksheets were compiled by Partsbase using certain Partsbase computer records. As discussed above, these materials are admissible under Fed. R. Evid. 1006 and do not violate the best evidence rule. <u>See</u> Fed. R. Evid. 1002 ("If data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an 'original.'")

ILS argues further, however, that some of the materials used to support the Invoice Evidence were not timely produced under Fed. R. Civ. P. 26(a). Rule 37(c) provides that if a party, without substantial justification, fails to produce evidence required by Rule 26, the evidence must be excluded unless the failure to

---

[6] Partsbase claims that the underlying materials at issue are inaccurately characterized as "invoices" and are, more specifically, computer records indicating the dates of customer transactions. For purposes of this motion, the court will use ILS's term.

21

produce it was harmless.  Partsbase contends, and ILS has not disputed, that Partsbase timely produced documents showing start and end dates for most relevant customers and inadvertently omitted materials relevant to those customers who merely decreased their business with ILS during the times material ("drop down" customers).  Partsbase claims that its failure to produce those documents was justified because, at the time, only ILS knew the names of the drop down customers.  ILS does not appear to contest this claim.  Further, although it now argues that the documents were responsive to prior discovery requests, ILS, although it knew the identities of the drop down customers, did not point out this omission when Partsbase responded to the prior discovery requests. Thus, the court concludes that the late production of the Invoice Evidence on January 31, 2005, was justified and harmless.  For the foregoing reasons, ILS's motion to strike Partsbase's summary judgment evidence is DENIED.

## VI. Dispositive Motions

### A. ILS's October 19 Motion to Dismiss

ILS contends that Counts II, VI, VII, and VIII of Partsbase's amended counterclaim should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

### 1. Count II: Tenn. Code. Ann. § 47-18-101

ILS argues that Partsbase's counterclaim fails to allege wrongful conduct in the course of "trade, commerce, or a consumer transaction" and, therefore, fails to state a claim under the

22

Tennessee Consumer Protection Act. See Tenn. Code Ann. § 47-18-103(11). For choice-of-law purposes, a claim for unfair trade practices sounds in tort. See Lipford v. First Family Financial Services, Inc., 2004 WL 948645, at *4 (Tenn. Ct. App. 2004)(unpublished)(holding that claim was "a tort action based on allegations of fraud and violations of the Tennessee Consumer Protection Act); see In re Bridgestone/Firestone, 138 S.W.3d 202, 208 (Tenn. Ct. App. 2003)(holding that Mexican law would control where accident occurred in Mexico and plaintiff brought claims under the TCPA); Musson Theatrical, Inc. v. Federal Express Corp., 2001 WL 370035, at *9 (Tenn. Ct. App. 2001)("the common law tort claims of fraud and negligent misrepresentation are aimed at addressing the same sort of activity that consumer protection acts are designed to address..."). Because Florida law applies to Partsbase's counterclaims, Partsbase's allegations do not state a claim under the Tennessee Consumer Protection Act. Thus, Count II must be DISMISSED.

### 2. Count VI: Common Law Conversion

PartsBase alleges that ILS has committed the tort of conversion by hacking into Partsbase's database to obtain customer passwords, accessing the entire customer list, and making changes to the database that sabotaged PartsBase's customer service relationships. ILS contends that Tennessee law does not recognize conversion of intangible property, but the court has determined that Florida law applies to the counterclaim. In Florida, "[a]ctions for conversion may properly be brought for a wrongful

23

taking over of intangible interests in a business venture." <u>In re Corbin's Estate</u>, 391 So.2d 731 (Fla. Dist. Ct. App. 1980) (footnote omitted); <u>see also</u> <u>CBS, Inc. v. Garrod</u>, 622 F. Supp. 532, 535 (M.D. Fla. 1985).  All that is necessary for conversion is an "act of dominion wrongfully asserted over another's property inconsistent with his ownership therein." <u>Warshall v. Price</u>, 629 So.2d 903 (Fla. Dist. Ct. App. 1993).  "It is not necessary for a person to deprive another of <u>exclusive possession</u> of their property in order to be liable for conversion." <u>Id.</u>

If PartsBase's allegations are true, this case is factually similar to <u>Warshall v. Price</u>, in which a Florida court held that a competitor who improperly accessed a client list and used it to solicit customers had converted the list. <u>Id.</u> PartsBase alleges that ILS accessed its customer service database without permission and used that information to sabotage customer service for PartsBase consumers.  Making unauthorized changes to the database is also an act of dominion both wrongfully asserted and inconsistent with PartsBase's ownership of the database.  PartsBase has stated a claim for conversion for which relief can be granted under Florida law.

### 3. Count VI: Common Law Trespass

PartsBase alleges that, by hacking into a secure level of PartsBase's electronic database, obtaining over 900 customer passwords, and making changes to the database that caused customer service problems for PartsBase customers, ILS has committed trespass.  Actions for trespass to electronic resources have been

24

characterized as trespass to chattels. <u>See</u>, <u>e.g.</u>, <u>eBay, Inc. v. Bidder's Edge, Inc.</u>, 100 F. Supp. 2d 1058, 1065 (N.D. Cal. 2000); <u>Register.com v. Verio, Inc.</u>, 126 F. Supp. 2d 238, 249 (S.D.N.Y. 2000). In Florida, trespass to chattels is "the intentional use of, or interference with, a chattel which is in the possession of another, without justification." <u>Coddington v. Staab</u>, 716 So.2d 850, 851 (Fla. Dist. Ct. App. 1998).

Florida has not addressed the issue of electronic trespass specifically, but in <u>Burshan v. National Union Fire Ins. Co. of Pittsburgh, PA</u>, a Florida appellate court held that "a bank account is not a chattel which can be the subject of a trespass." 805 So.2d 835, 846 (Fla. Dist. Ct. App. 2001). In that case, the plaintiff attempted to bring an action for trespass to chattels arising from the wrongful garnishment of wages from his bank account. The court defined the term chattel as:

> Every species of property, movable or immovable, which is less than a freehold. Personal chattels are properly things movable, which may be carried about by the owner; such as animals, household stuff, money, jewels, coin, garments, and everything else that can be put in motion and transferred from one place to another."

<u>Id.</u> (internal citations omitted). The court did not further discuss this definition, but cited earlier Florida cases regarding trespass to <u>movable</u> personal property. <u>Id.</u> Thus, in Florida, an action for trespass to chattels must involve movable personal property.

A database, like a bank account, is not movable personal property. The information in the database, like the money in a bank account, can be transferred or otherwise moved; but the database

25

itself, like the bank account, is an intangible structure. The cases establishing an action for electronic trespass to chattels have characterized the chattel at issue as a server. Laura Quilter, Cyberlaw: Regulating Conduct on the Internet, 17 Berkeley Tech. L.J. 421, 439 (2002) (referring to eBay, Inc., 100 F. Supp. 2d at 1070; Register.com, 126 F. Supp. 2d at 249). An internet server is a movable object, but the interference at issue in these cases involved misuse of the electronic structure supported by the server. See, e.g., eBay, Inc., 100 F. Supp. 2d at 1070, ("spider" program collecting data from eBay's website was trespassing); Register.com, 126 F. Supp. 2d at 249 ("spider" program collecting data from online database was trespassing because misuse of the database could diminish server capacity); TicketMaster Corp. v. Tickets.com, Inc., 2000 WL 525390, at *4 (C.D. Cal. March 27, 2000), aff'd 2 Fed. Appx. 741 (9th Cir. 2001) ("spider" program collecting data from website was not trespassing because site was open to the public).

Jurisdictions recognizing electronic trespass to chattels have focused on the misuse of a database or website, which is an intangible structure. Partsbase does not explicitly allege interference with its physical server, only unauthorized access to its electronic database. Because Florida has previously held that trespass to chattels must involve movable personal property, the state does not recognize a cause of action for trespass to chattels in cyberspace. PartsBase has failed to state a claim for trespass for which relief can be granted under Florida law. Thus, the claim

for common law trespass in Count VI must be DISMISSED.

### 4. Count VII: Violation of Florida DUTPA

ILS argues that PartsBase has alleged no facts in support of
its Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")
claim. "To avoid dismissal under Rule 12(b)(6), a complaint must
contain either direct or inferential allegations with respect to
all material elements of the claim." <u>Wittstock v. Mark A. Van Sile,
Inc.</u>, 330 F.3d 889, 902 (6th Cir. 2003). In its counterclaim,
PartsBase incorporates all of the factual allegations made
throughout the document, arguing that those facts, if true, are a
violation of the Florida Deceptive and Unfair Trade Practices Act.
ILS argues that Partsbase's claim should be dismissed because
Partsbase failed "to point out any specific subsection of the DUTPA
that ILS allegedly violated." (Mot. to Dismiss at 4.)   Such
specificity is not required to satisfy the requirements of notice
pleading in the Federal Rules of Civil Procedure.

In response to ILS's motion to dismiss, PartsBase further
clarifies that the conduct incorporated by reference in ¶ 51 of the
amended counterclaim violates FDUPTA § 501.204(1): "Unfair methods
of competition, unconscionable acts or practices, and unfair or
deceptive acts or practices in the conduct of any trade or commerce
are hereby declared unlawful."   The FDUPTA contains a further
provision that it should be liberally construed to protect
legitimate business enterprises. FDUPTA § 501.201.   The factual
allegations incorporated in ¶ 51 of the amended counterclaim
include ILS's unauthorized use and manipulation of the PartsBase

database, ILS's false and misleading statements about PartsBase to consumers, and ILS's bad-faith pursuit of litigation against PartsBase. These allegations, if true, are sufficient to state a FDUTPA claim. The information is enough to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957). That Partsbase is a business competitor rather than a consumer does not require dismissal, where the actions alleged are those described in § 501.204(1). <u>See</u> <u>Niles Audio Corp. v. OEM Systems Co., Inc.</u>, 174 F. Supp. 2d 1315, 1319 (S.D. Fla. 2001).

### 5. Count VIII: Inequitable Conduct

Partsbase concedes that the allegations set forth in Count VIII should be treated as an affirmative defense to ILS's complaint, rather than a cause of action in the counterclaim. "When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." Fed. R. Civ. P. 8(c). Thus, the court will treat the allegations of "inequitable conduct" as an affirmative defense to ILS's complaint. Any cause of action asserted in Count VIII is, therefore, DISMISSED.

### B. Partsbase's January 31 Motion for Partial Summary Judgment Dismissing Lost Profits Damage Claim

Partsbase's motion for partial summary judgment on ILS's lost profits claim is based largely on its motion <u>in</u> <u>limine</u> to exclude John Slater's expert report on the issue of damages. Partsbase

argues that Slater's calculation of lost profits fails properly to account for certain factors and is based on unsupported assumptions. As discussed above, these arguments are based, in part, on unresolved factual issues. Partsbase contends that ILS has not produced concrete evidence linking the decision of certain customers to leave ILS with any alleged wrongful actions on the part of Partsbase. ILS offers the affidavit of Vice President James Sdoia. Sdoia states that subscribers to ILS's database have access to information about ILS supplies and other subscribers, including contact information. (Sdoia Aff. ¶ 2.) Sdoia further states that passwords are not generally known, that ILS subscribers are not allowed to offer, sell, distribute, or otherwise supply to any third party information obtained from ILS's database, and that Partsbase was never granted access to ILS's computers. (Id. ¶ 4-5.)

Sdoia claims that, nevertheless, ILS began receiving complaints from customers that they had been contacted by Partsbase soon after opening an account with ILS. (Id. ¶ 6.) ILS then set up multiple "Trojan Horse" companies whose contact information existed only in the ILS database. Partsbase solicited at least two of those entities using the contact information in the ILS database. (Id. ¶¶ 7-8.) The foregoing evidence, considered in the light most favorable to ILS, suggests that at least some of the business that ILS lost can be attributed to the allegedly wrongful conduct of Partsbase. Because the apportionment of lost profits between lawful and unlawful competition is a disputed issue of material fact, Partsbase's motion for summary judgment must be DENIED.

## C. Partsbase's January 31 Motion for Partial Summary Judgment Dismissing Count III

Partsbase moves for summary judgment on Count III of the complaint, ILS's claim for misappropriation of trade secrets under Tenn. Code Ann. § 47-25-1701, et seq. (hereinafter "Uniform Trade Secrets Act"), because ILS has failed to establish that the information in its database qualifies for trade secret protection and because ILS is time-barred from asserting its claim as to at least some of the allegedly proprietary information.

Tennessee law defines a trade secret as follows:

> Information, without regard to form, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process or plan, that: (A) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (B) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4).[7]  Partsbase contends that ILS did

---

[7] For purposes of this motion, the requirements under the common law are substantially similar to those under the Uniform Trade Secrets Act. The common law defined a trade secret as "any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." Hickory Specialties, Inc. v. B & L Labs, 592, S.W.2d 583, 586-87 (Tenn. Ct. App. 1979). Common-law factors to consider in determining whether information constitutes a trade secret are (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of money or effort expended by the business in developing the information and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Venture Express, Inc. v. Zilly, 973 S.W.2d 602, 606 (Tenn. Ct. App. 1998).

not take reasonable efforts to maintain the secrecy of its database and that ILS's customer list was readily ascertainable by proper means.

Partsbase offers evidence that contact information for 193 of the 288 customers forming the basis of ILS's damage claim can be obtained through the World Aviation Directory, the National Business Aviation Association directory, or the internet. (Weicher Aff. Ex. C.)  Partsbase also contends that ILS has approximately 5,000 different customer companies and that the employees of those companies may generally access ILS's database.  In response, ILS contends that the information in its database is "more than just a customer list," because it contains valuable information about the specific product needs of the subscribing customers. (Sdoia Aff. ¶ 2.)  Partsbase does not appear to contend that any of this information is publicly available.  Further, the Trade Secret Act's protection of "compilations" means that the mere fact that a particular customer's contact information can be obtained elsewhere does not negate trade secrecy protection in the list as a whole, if the list is combined or arranged in a manner that is proprietary and economically valuable.

Partsbase also argues that the wide distribution of the ILS database among ILS's customers means that ILS has not taken reasonable efforts to safeguard the secrecy of its database.  ILS offers evidence that all of its customers must execute a Subscriber Agreement prohibiting them from conveying any information obtained from the ILS database to a third party. (Sdoia Aff. ¶3.)  ILS also

31

requires a user password to access its database and prevents
multiple users from using a password simultaneously. (Id. ¶ 4.)
Although a larger number of customers makes a breach of
confidentiality safeguards more likely than if there were fewer
customers, the court cannot conclude the above safeguards are per
se unreasonable. See, e.g., Physicians Interactive v. Lathian
Systems, Inc., 2003 WL 23018270, at *8 (E.D. Va. 2003).
"Determination of whether information constitutes a trade secret is
a question of fact." Eagle Vision, Inc. v. Odyssey Medical, Inc.,
2002 WL 1925615, at *4 (Tenn. Ct. App. 2002)(citing Venture Express
v. Zilly, 973 S.W.2d 602, 606 (Tenn. Ct. App. 1998)). Based on the
foregoing evidence, there are genuine issues of material fact about
the public availability of the information in ILS's database and
the efforts undertaken by ILS to safeguard the secrecy of that
information.

Partsbase contends that some of the information on which ILS's
trade secret claim is based was obtained by Partsbase in 1998
(referenced above as the "1998 incident"), before the Uniform Trade
Secrets Act was enacted. Partsbase argues, therefore, that ILS has
failed to state a claim under the Uniform Trade Secrets Act or,
alternatively, that such a claim is time-barred. The Uniform Trade
Secrets Act provides:

> This act takes effect on July 1, 2000, the
> public welfare requiring it, and does not
> apply to misappropriation occurring prior to
> the effective date. With respect to a
> continuing misappropriation that began prior
> to the effective date, the act also does not
> apply to the continuing misappropriation that

occurs after the effective date.

2000 Tenn. Pub. Acts 647, § 11; see also Tenn. Code Ann. § 47-25-1701 (compiler's notes). Thus, the Uniform Trade Secrets Act does not provide a cause of action for misappropriation that occurred before July 1, 2000, whether or not the misappropriation continued after that date. ILS has not, therefore, stated a claim under the Uniform Trade Secrets Act for misappropriation arising from the 1998 incident.

ILS's claim for misappropriation is not barred, however, if it meets the requirements under the common law predating the enactment of the Uniform Trade Secrets Act.[8] See, e.g., Eagle Vision, Inc. v. Odyssey Medical, Inc., 2002 WL 1925615, at *3 (Tenn. Ct. App. 2002). A cause of action for tortious injury to property must be commenced within three years after it has accrued. Tenn. Code Ann. § 28-3-105. A cause of action accrues, and the statute of limitations begins to run, when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered. Potts v. Celotex Corp., 796 S.W.2d 678, 680 (Tenn. 1990)(citing McCroskey v. Bryant Air Conditioning Co., 524, S.W.2d 487, 491 (Tenn. 1975)). The statute is tolled only for the period during which the plaintiff had no knowledge at all that the wrong had occurred and, as a reasonable person, was not put on inquiry. Id. at 680-81 (citing Hoffman v. Hospital Affiliates,

---

[8] Although ILS specifically invokes the Uniform Trade Secrets Act in its complaint, Count III meets the requirements of notice pleading under Fed. R. Civ. P. 8 so as to state a claim for misappropriation of trade secrets under common and statutory law.

_Inc._, 652 S.W.2d 341, 344 (Tenn. 1983)). ILS commenced this action on September 5, 2002. Thus, ILS's common law claims for misappropriation of trade secrets arising from the 1998 incident are time-barred absent some showing that ILS's discovery of its cause of action was reasonably delayed.

As discussed above, Partsbase was a former corporate subsidiary of Aviation Labs, Inc., which was a customer of ILS in 1998. ILS has submitted evidence that, when Partsbase was attempting to compete with ILS as a separate entity, it used Aviation Labs' access to the ILS customer list and database to contact potential customers for its own purposes. When Partsbase was a division of Aviation Labs, it began creating a customer database using the information available to Aviation Labs. ILS discovered that Partsbase was obtaining customer information from ILS's database via Aviation Labs and, consequently, terminated Aviation Labs as a customer as of October 1, 1998. ILS's President, Bruce Langsen, stated that

> the one time we [ILS] threw Aviation Labs off of our system was because Partsbase was being started and operated in their backrooms and _it was obvious at that time_ that they were using our database to garner their leads. ... [Partsbase] had acquired a listing of our specific customers by name and by phone number, and were calling them representing to be a competing service and using that information to build their own customer count.

(Langsen Depo. 20-23)(emphasis added).

ILS contends that in 1998, it had enough knowledge of Partsbase's actions to justify terminating the account of Aviation

Labs, but not enough to reasonably discover a cause of action based on that conduct.   In support, ILS submits the Sdoia affidavit, which does not refer to the actions ILS took to discover a cause of action arising from the 1998 incident, and Langsen's deposition testimony, which states as follows:

> Q. So you determined that was going through Aviation Labs to Partsbase and cut off Aviation Labs?
>
> A. We made a supposition at that point that since they were sharing the same address and that everything seemed to lead back to Partsbase, that we could no longer allow Aviation Labs to be a customer.
>
> Q. I thought you also said in addition to a supposition that you had some verification.
>
> A. We verified in some respects that we were indeed getting – our customers were getting phone calls from people at Partsbase to phone numbers that wouldn't otherwise be typically available.   Later, when that happened, I believe in [2001 or 2002], we had our lawyers issue a cease and desist to Partsbase.

(Langsen Depo. 26:10-17.)   Langsen's testimony, if anything, undermines ILS's claim that it could not have reasonably discovered that Partsbase was misappropriating its database until some later date.   Thus, ILS is time-barred from asserting claims that arose from the 1998 incident.   If certain entities became customers of Partsbase before September 5, 1999, because of Aviation Labs' access to ILS's database, ILS may not include those customers in its damages claim for lost profits under Count III.

Partsbase presents evidence that, of the 288 customers that Partsbase allegedly "poached" in the instant cause of action, nine

(9) of those companies became customers of Partsbase before September 5, 1999. Those companies are identified by Mark Weicher, Chief Financial Officer of Partsbase, as follows: 1) Panatech Components, 2) Myriad Airspares Corp., 3) Adco & QEH Enterprises, 4) Bombardier Flight Test, 5) Air Midwest, 6) Aviation Technologies, 7) Tri-County Instruments, 8) Key Enterprises, and 9) Airnow. (Weicher Aff., Ex. A.)   ILS presents no evidence challenging Weicher's affidavit. Thus, these customers could not have been "poached" within the applicable limitations period, and Partsbase's motion for summary judgment on Count III as to the identified customers must be GRANTED.

There is no evidence in the record clearly indicating that Partsbase unlawfully misappropriated proprietary information about other ILS customers, causing them to reduce or terminate their business with ILS, before September 5, 1999.[9]  Thus, there is still a genuine issue of material fact, and ILS's motion for summary judgment on Count III as to customers other than the nine identified in the Weicher affidavit must be DENIED.

### D. Partsbase's January 31 Motion for Partial Summary Judgment Dismissing Count IV

---

[9] Partsbase also offers evidence that, of the 288 customers, "178 were in the ILS database prior to October 1, 1998." (Resp. at 7.)  That these companies were in the ILS database does not show conclusively that Partsbase unlawfully accessed ILS's proprietary information or when, if at all, those customers began doing business with Partsbase instead of ILS.  ILS contends that part of the proprietary information contained in its database consists of the specific inventory needs of its customers, which can change over time. Thus, the fact that Partsbase may have seen the listings for 178 customers in 1998 does not show, where Partsbase did not continue to do business with those customers or otherwise "use" the information, that access to those listings would have given rise to the cause of action asserted in Count III.

In Count IV, ILS alleges that Partsbase violated 18 U.S.C. § 2701, the Electronic Communications Privacy Act ("ECPA"). Partsbase argues that the evidence in the record suggests only that it accessed the ILS database using passwords provided to it by authorized ILS customers. Partsbase contends that this conduct does not violate the ECPA.

The ECPA provides as follows:

> **(a) Offense** – Except as provided in subsection (c) of this section whoever
> (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or
> (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.[10] ...
> **(c) Exceptions** – Subsection (a) of this section does not apply with respect to conduct authorized ... (2) by a user of that service with respect to a communication of or intended for that user. ...

18 U.S.C. § 2701 (emphasis added). Partsbase contends that its alleged conduct falls within the exception in 18 U.S.C. § 2701(c)(2) because it was authorized by the ILS customers who provided their passwords.

As both parties suggest, there is little case law interpreting the ECPA. Partsbase cites <u>Sherman & Co. v. Salton Maxim Housewares, Inc.</u>, 94 F. Supp. 2d 817 (E.D. Mich. 2000), in which

---

[10] 18 U.S.C. § 2701 is a criminal statute, for which a civil damages remedy is provided in 18 U.S.C. § 2707(c).

the defendant[11] was accused of using the access code provided by the plaintiff, his former employer, to access a client's database and provide sensitive information to the plaintiff's competitor. In interpreting 18 U.S.C. § 2701(a), the Sherman court cited, as examples of unauthorized access by a defendant, "using a computer he was not to use, or obtaining and using someone else's password or code without authorization." Sherman, 94 F. Supp. 2d at 821. Partsbase contends that its alleged conduct is excluded from this definition because it obtained and used the ILS password(s) with the permission of the ILS customers. The parties' reliance on Sherman, however, is misplaced. In that case, the court determined the scope of § 2701(a), which requires an individual to receive "authorization" generally, or alternatively § 2701(c)(1), which provides an explicit exception where the conduct is authorized by the person or entity providing the electronic communication service. See id. The court held that the defendant's access to the client's database was not "unauthorized" because the client, who provided the service, had done nothing to restrict the defendant's access while, or after, he was employed by the plaintiff. Id.

ILS offers evidence that Partsbase accessed areas of ILS's database without ILS's permission. There is little question, therefore, that § 2701(a) applies to the alleged conduct and that

---

[11] In Sherman, the ECPA claim was actually a counterclaim. For purposes of clarity, the counter-claimant is referred to as the "plaintiff," and the counter-defendant as the "defendant."

§ 2701(c)(1) does not provide an exception. Section 2701(c)(2) provides an exception to § 2701(a) when the conduct is "authorized ... by a user of that [electronic communications] service with respect to a communication of or intended for that user ...." If, as Partsbase suggests, it accessed ILS's database using passwords freely provided by ILS customers, its conduct was, to some extent, authorized by users of the ILS service. The exception only applies, however, to the extent that a user authorizes third-party access "with respect to a communication of or intended for that user." The clearest meaning of this phrase is that a third party, not granted access by the primary service provider, will nevertheless not be held liable if it accesses the protected service only to send or receive a communication on behalf of an authorized user. The evidence offered by ILS, that Partsbase used the passwords to obtain protected information about other customers and contact those customers, suggests a course of conduct that exceeds this narrow exception. Thus, Partsbase's motion for summary judgment on Count IV must be DENIED.

Partsbase also contends that ILS has failed to offer adequate evidence of damages under 18 U.S.C. § 2707(c). Damages for violations of the ECPA are equal to "the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000. If the violation is willful or intentional, the court may assess punitive damages." 18 U.S.C. § 2707(c). "Thus, for each violation of the Act, the

39

aggrieved party is entitled to the greater of actual damages caused by the profits obtained from a violation or $1,000." United Laboratories v. Rukin, 1999 WL 608712, at *5 (N.D. Ill. 1999)(emphasis in original).  Partsbase argues that John Slater's expert report on damages should be excluded and that ILS has not provided evidence of the specific number of times that Partsbase allegedly violated the ECPA.  As discussed above, the Slater report sets forth the lost profits that ILS allegedly suffered because of Partsbase's intrusion into ILS's database, and the report will not now be excluded from evidence.  Thus, ILS has offered sufficient evidence of damages under § 2707(c) to overcome summary judgment, even if, as Partsbase contends, ILS has not provided evidence demonstrating the specific number of violations of the ECPA.[12]

### E. Partsbase's January 31 Motion for Partial Summary Judgment Due to Statute of Limitations and "Non-Customers"

This motion incorporates one of the arguments that Partsbase made in its motion for summary judgment on Count III, namely, that certain claims arose outside the limitations period and are time-barred, and seeks to apply it to Counts I-IV.  In response, ILS again argues that, although it had sufficient knowledge of Partsbase's conduct in 1998 to revoke Aviation Labs' access to the ILS database, it could not have discovered a cause of action arising from the 1998 incident.  As discussed above, this argument is without merit.

---

[12] If ILS wishes to rely on the statutory minimum of $1000 per violation, it will, of course, have to submit admissible evidence of the precise number of violations.

Based on the acts alleged in the complaint, ILS asserts causes of action for violation of the Computer Fraud and Abuse Act (Count I), common law interference with existing business relations (Count II), misappropriation of trade secrets (Count III), and violation of the ECPA (Count IV). September 5, 1999, is the earliest date on which a cause of action for Counts II and III could have accrued,[13] and September 5, 2000, is the earliest date on which a cause of action for Counts I and IV could have accrued.[14] Partsbase offers evidence that other companies left ILS before the respective causes of action accrued, so as to deprive ILS of a claim for damages based on business lost from those customers.

**1. Count I**

The Computer Fraud and Abuse Act subjects to liability anyone who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains ... information from any protected computer if the conduct involved an interstate or foreign communication." 18 U.S.C. § 1030(a)(2)(C). It also provides a cause of action against one who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value,

---

[13] The statute of limitations for interference with business relations is three years. See Tenn. Code Ann. § 28-3-105; Carruthers Ready Mix v. Cement Masons Local Union 520, 779 F.2d 320, 324 (6th Cir. 1985). The statute of limitations for misappropriation of trade secrets, under common or statutory law, is also three years. See Tenn. Code Ann. § 28-3-105; Tenn. Code Ann. § 47-25-1707.

[14] The statute of limitations for both the Computer Fraud and Abuse Act and the ECPA is two years. See 18 U.S.C. § 1030(g); 18 U.S.C. § 2701(f).

41

unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5000 in any 1-year period." 18 U.S.C. § 1030(a)(4).   ILS asserts causes of action under each of these provisions.   The damages available to a plaintiff are "compensatory damages and injunctive or other equitable relief." 18 U.S.C. § 1030(g).

Partsbase contends that 144 companies became customers of Partsbase before September 5, 2000, and that 178 customers were in the ILS database in 1998, when Partsbase had access to the database through its association with Aviation Labs.   Partsbase argues that claims asserted in Count I that are based on "the loss of" these customers are barred by the statute of limitations.   The factual allegations in the amended complaint do not contain dates, which would provide some guidance as to what alleged acts are the source of ILS's damages claims under the Computer Fraud and Abuse Act. Additionally, neither party attempts to explain how the existence of 178 customers in the ILS database in 1998, or 144 customers who began doing business with Partsbase before September 5, 2000, is related to the computer crimes asserted in Count I, so as to anticipate Count I for limitations purposes.

Partsbase has not shown, and the court cannot conclude, that Partsbase's alleged access to the ILS database through its association with Aviation Labs, or Partsbase's business relations with 144 customers, would reasonably put ILS on notice of a subsequent cause of action for computer fraud.   Thus, Partsbase's motion for summary judgment on Count I is DENIED.   It is also

42

difficult, however, to see how the actions of 144 customers before September 5, 2000, or Partsbase's access in 1998 to information about 178 ILS customers, can serve as a basis for damages for computer fraud that necessarily occurred after those dates.

### 2. Count II

Partsbase contends that nine (9) companies became customers of Partsbase before September 5, 1999, and that 178 customers were in the ILS database in 1998, when Partsbase had access to it through its association with Aviation Labs. As discussed above, that 178 companies were in the ILS database in 1998 does not show when, if at all, those customers began doing business with Partsbase instead of ILS, so as to support a damages claim based on lost profits from those 178 customers. More importantly, ILS contends that part of the proprietary information contained in its database consists of the specific inventory needs of its customers, which can change over time. Thus, the fact that Partsbase may have seen the listings for 178 customers in 1998 does not show, absent specific evidence that Partsbase continued to do business with those customers, that ILS had a cause of action for tortious interference with business relations based on Partsbase's prior access.

Partsbase also submits a list, compiled by Weicher from Partsbase business records, of nine (9) former ILS customers, all of whom received invoices from, or transacted business with, Partsbase before September 5, 1999. (Weicher Aff. Ex. A.) ILS does not challenge this evidence, which shows that Partsbase was conducting business with these companies before September 5, 1999.

43

After the 1998 incident, ILS suspected that Partsbase had accessed its customer database in an attempt to solicit those customers on its own behalf. Due diligence would at least have required ILS to ask its customers whether they had been contacted by, or were doing business with, Partsbase. Thus, ILS was put on inquiry notice that Partsbase was attempting to interfere with its business relationship with the nine cited customers. See Potts v. Celotex Corp., 796 S.W.2d. 678, 680-81 (Tenn. 1990) (citing Hoffman v. Hospital Affiliates, Inc., 652 S.W.2d 341, 344 (Tenn. 1983)). Thus, to the extent that Count II is based on the alleged interference with ILS's business relationship with the nine customers listed in Exhibit A to the Weicher Affidavit, Partsbase's motion for summary judgment is GRANTED. The motion for summary judgment on Count II is DENIED as to claims arising from ILS's relationship with other customers.

### 3. Count III

Partsbase's arguments for summary judgment on Count III have been addressed above. The July 1, 2000, effective date of the Uniform Trade Secrets Act does not preclude ILS from asserting misappropriation that occurred before that date, if the alleged offenses occurred within the statute of limitations applicable under the common law. The statute of limitations for conduct that occurred before the enactment of the Uniform Trade Secrets Act is three years. See Tenn. Code Ann. § 28-3-105. As discussed above, Partsbase offers evidence that it began doing business with nine customers before September 5, 1999. Thus, where the alleged trade

44

secrets consist of the contact information and inventory needs of those nine customers, ILS's cause of action for misappropriation accrued more than three years before ILS filed suit.  To the extent that Count III asserts misappropriation of information about the nine customers in Exhibit A of the Weicher Affidavit, Partsbase's motion for summary judgment is GRANTED.  Partsbase's motion is DENIED on claims of misappropriation relating to other customers.

### 4. Count IV

Similar to Count I, Count IV alleges unauthorized access to an electronic communication service under the ECPA.  The ECPA has a two-year statute of limitations.  Thus, Partsbase reiterates its arguments for summary judgment on Count I.  As with Count I, neither party has shown that Partsbase's alleged access to the ILS database through its association with Aviation Labs, or Partsbase's business relations with 144 customers, would reasonably put ILS on notice of a subsequent cause of action for unauthorized access to an electronic communications service.  Therefore, summary judgment cannot be granted on Count IV on the basis of the statute of limitations.  Likewise, it is difficult to see how the 1998 incident or the actions of 144 customers before September 5, 2000, can serve as a basis for damages for unauthorized access to an electronic communications service that necessarily occurred after those dates.

### F. ILS's January 31 Motion for Partial Summary Judgment

ILS argues that there is no issue of material fact that would

45

preclude its success on Counts I-IV in the amended complaint and dismissal of Partsbase's counterclaim.

## 1. ILS's Amended Complaint, Counts I-IV

As discussed above, ILS has submitted evidence 1) that Partsbase obtained ILS passwords and used them to gain unauthorized access to ILS's computer-supported database (Statement of Undisputed Facts ¶¶ 11-13), 2) that its own customers would complain of being contacted by Partsbase soon after subscribing to ILS's service (Id. ¶ 9), and 3) that it created a number of "Trojan Horse" companies, which existed only in its protected database, and that Partsbase attempted to contact those fictitious companies. In response, Partsbase refers to the arguments made in its other motions. Partsbase also claims that it did not need to engage in unlawful activity to compete with ILS and that Partsbase established a company policy prohibiting its employees from unauthorized use of competitors' sites and systems. (See Resp. Ex. 2.)

"Partsbase has candidly and forthrightly admitted that some of its employees or former employees obtained ILS passwords from ILS customers and used those to access ILS' computer." (Partsbase Resp. ¶ 11.) Partsbase offers the deposition testimony of Partsbase President Robert Hammond that the unauthorized entry into ILS's database was against company policy and outside the scope of its employees' employment with Partsbase. (Hammond Depo. 33:3-24.) The mere fact that Partsbase employees may have been acting contrary to company policy does not mean that they were acting outside the

46

scope of their employment; the question is whether the employee is acting on behalf of his employer or for some purpose of his own. See Craig v. Gentry, 792 S.W.2d 77, 80 (Tenn. Ct. App. 1990). Whether employees are acting within the scope of their employment, however, is normally a question left to the factfinder. Id. Thus, based on Hammond's deposition testimony, there is a genuine issue of material fact about whether Partsbase is liable for its employees' unauthorized entry into ILS's database. As discussed above, there are also genuine factual disputes about whether ILS's customer information qualifies as a trade secret and whether the actions of, or information about, certain customers can serve as a basis for ILS's damages claims. Thus, ILS's motion for partial summary judgment on Counts I-IV must be DENIED.

### 2. Partsbase's Counterclaims

In support of its counterclaims, Partsbase offers "web server logs," which purport to record various unlawful entries into Partsbase's computer system from an internet protocol ("IP") address assigned to ILS. ILS seeks to exclude this evidence, arguing that 1) the logs are "incredible on their face," 2) the logs appear to have been altered, 3) the logs have been moved and deleted, and 4) the logs are inadmissible hearsay.

ILS argues that Partsbase's log records show more than 2 million entries onto Partsbase's web site in a span of 17 months. ILS contends that this number of entries would have constituted approximately 5% of Partsbase's web traffic and that Partsbase would have noticed this phenomenon earlier if it were indeed

happening. Partsbase challenges this assertion, claiming that the logs do not show such a high number of entries on its web site. The court is not in a position to determine whether log records show so many entries within a given time period as to be "incredible on their face" as a matter of law. ILS's arguments go to the probative value of the logs, not to their admissibility.

More importantly, ILS contends that the logs have been fabricated or altered. As evidence, ILS cites what the parties refer to as the "cookie anomaly." When a user from a specific IP address logs onto the Partsbase web site, an identifying record associated with a user's computer, called a "cookie," is created and recorded alongside the entry in the server logs. (ILS Stat. of Facts ¶ 20.) The cookie normally contains, among other information, the IP address from which the user was logging in. (Id.) ILS contends that, in none of the entries that Partsbase proffers as coming from ILS's IP address does the corresponding cookie match ILS's IP address. Weighing the relevance of the "cookie anomaly" requires detailed knowledge about computers and internet communications. Absent more detailed evidence or expert testimony, the court is not in a position to conclude that such a discrepancy undermines the authenticity of Partsbase's log records.

Partsbase submits the affidavit of Douglas Rehman, president of a technological services firm, stating that the cookie anomaly resulted from a technical glitch and was not confined to entries from ILS's IP address. He states that there were 14,121 other unique IP addresses that also contained the cookie anomaly. (Rehman

Aff. ¶ 4.)   He further states that he unsuccessfully attempted to create anomalous log records by manipulating the cookie of his own computer.   He concludes from these failed attempts that "the malformed cookie is not caused by a malicious human being, but by some flaw in the Partsbase cookie software code." (Id. ¶ 9.)   Brian Tolley, Chief Information Officer for Partsbase, states that the logs were generated automatically by Partsbase's computers in the regular course of business. (Tolley Aff. ¶ 3.)   Considering these two affidavits together, the court cannot conclude that the cookie anomaly renders the disputed log evidence inauthentic or unreliable so as to require its exclusion.

Partsbase also contends that the logs have been "moved or deleted."   The web server logs for the year 2003 were produced during discovery by Partsbase on 19 compact discs ("CDs").   ILS claims that the 19 CDs were created specifically for the litigation and were not kept or maintained in the regular course of business. As discussed above, this argument is without merit.   Summaries or compilations of otherwise admissible records or documents may be introduced to aid the court. See Fed. R. Evid. 1006; Martin v. Funtime, 963 F.2d 110, 116 (6th Cir. 1992); see also Fed. R. Evid. 1002 ("If data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an 'original.'") ILS further contends, however, that the 2003 logs were deleted from Partsbase's server and stored on an external hard drive and were then copied back onto the server and deleted from the external hard drive.   ILS argues that this

process of copying and deleting was not part of Partsbase's regular course of business and undermines the authenticity of the proffered records. That the process of copying the log records may not have been part of Partsbase's business does not mean that the underlying content of the logs are not business records. Again, Partsbase has produced evidence that the logs themselves are generated in the regular course of its business, and the copies of computer records will be considered "originals" for purposes of the Rules of Evidence if they are shown to reflect the data accurately. See, e.g., Trans-Rim Enterprises, Ltd. v. Adolph Coors Co., 53 F.3d 338, 1995 WL 231381 (10th Cir. 1995).

That the records have been copied does not, by itself, undermine their authenticity or accuracy. Partsbase also has produced evidence that the logs were deleted from Partsbase's server to make space available, a standard practice undertaken without consideration of the instant litigation. (Wagner Aff. ¶ 7.) Fred Wagner, the Partsbase employee who made the copies of log records at issue, states that all of the records produced are true and exact copies and that he never altered or falsified any of the information. (Id. ¶¶ 9, 14.) Wagner also states that all of the non-2003 records are exact copies made from backup tapes that he retrieved when searching Partsbase's archives of electronic records. (Id. ¶ 12.) Because the logs have been duly authenticated as business records, they are not inadmissible hearsay. See Fed. R. Civ. P. 803(6). For the foregoing reasons, Partsbase's log records will not be excluded on the grounds argued by ILS, and the court

50

will consider them in deciding ILS's motion for summary judgment.

ILS claims that it is entitled to summary judgment on Partsbase's counterclaims under the TCPA and FDUTPA, as well as Partsbase's counterclaims for trespass, conversion, and inequitable conduct. Partsbase's counterclaims for trespass, inequitable conduct, and violation of the TCPA have been dismissed. Thus, ILS's motion for summary judgment on those claims is DENIED as moot.

As analyzed above, Partsbase has stated claims for conversion and violation the FDUTPA. The log records at issue support Partsbase's allegations that ILS unlawfully accessed and manipulated the information in Partsbase's database. The FDUTPA "is not limited to purely consumer transactions. It is now intended by its plain text to apply to any act or practice occurring 'in the conduct of any trade or commerce,' even as between purely commercial interests." Beacon Property Management, Inc. v. PNR, Inc., 890 So. 2d 274, 278 (Fla. Dist. Ct. App. 2004)(quoting the FDUPTA). Thus, for the reasons given above, ILS's motion for summary judgment for Partsbase's counterclaims for conversion and violating the FDUTPA is DENIED.

### G. Partsbase's "Pretrial Motion Concerning the Legal Status of (A) The ILS Supplier Directory, and (B) The ILS Database Accessible to 5000 Customers and Their Employees"

In this motion, Partsbase again argues that the ILS customer information cannot qualify for trade secrecy. The court will construe this motion as a supplemental motion for summary judgment on Count III of the amended complaint. As discussed above, there

are genuine issues of material fact about whether the ILS customer database contains trade secrets.  In the prior motion for summary judgment on Count III, however, neither party sought to distinguish among different bodies of information in the "ILS customer database."  Partsbase now contends that the ILS supplier directory cannot qualify for trade secret protection because it was widely distributed without protections of confidentiality.  As opposed to the ILS information accessible by computer, paper copies of the ILS supplier directory were distributed at least once a year to ILS's 5,000 customers.  Partsbase submits evidence that the Supplier Directory was not marked "confidential" and does not contain any prohibition on its use or distribution. (Sdoia Depo. Ex. 4.)  ILS does not dispute this evidence.  The only evidence of ILS's subjective expectations about the use of the supplier directory is the following Rule 30(b)(6) deposition testimony:

> Q. What steps - have you taken any other steps to protect the supplier directory information other than just limiting it to the five thousand or so people that you send it to?
> A. It is again controlled circulation only to ILS subscribers who have a listing with ILS and it is not made available to any other individuals.
> Q. Do you require that your - that the people that have this [the supplier directory] keep it under lock and key?
> A. No, sir, we do not.  We expect that they will use it within their offices for their use in terms of their business.
> Q. Do you require anybody to keep a log of who uses it?
> A. No, sir, we do not.

(Sdoia Depo. 63:12-64:3.)

This testimony contains no evidence of affirmative steps taken

to safeguard the secrecy of the supplier directory. That the supplier directory was distributed "only" to ILS's 5,000 customers is not evidence that ILS sought to limit access to the directory, where no steps were taken to limit the customers' use or distribution of the directory once it was in their possession. The burden of establishing trade secrecy is on the plaintiff, and absent such a showing, there is no genuine factual dispute about whether the supplier directory qualifies as a trade secret. Thus, Partsbase's motion seeking summary judgment that Count III cannot proceed on the ground that Partsbase misappropriated information in the supplier directory is GRANTED. As discussed above, however, there are genuine issues of material fact about whether ILS's computer-accessible database contains trade secrets. Thus, Partsbase's motion is DENIED on all other grounds.

### H. ILS's July 6 Supplemental Motion for Partial Summary Judgment

ILS moves for summary judgment on Count IX of Partsbase's amended counterclaim on the ground that Partsbase is not the provider of an "electronic communication service" for purposes of the ECPA. ILS contends that the ECPA provides a cause of action only to those who are "internet service providers" in the traditional sense, and not to online merchants who happen to allow consumers to buy goods or services on the internet. "The ECPA defines 'electronic communication service' as 'any service which provides the users thereof the ability to send or receive wire or electronic communications." <u>Dyer v. Northwest Airlines</u>, 334 F.

Supp. 2d 1196, 1198 (D.N.D. 2004)(quoting 18 U.S.C. § 2510(15)). ILS is correct in asserting that this definition does not encompass entities that merely use the internet to sell goods or services. See id. at 1199; In re Doubleclick, Inc. Privacy Litigation, 154 F. Supp. 2d 497, 511 n.20 (S.D.N.Y. 2001).

ILS is incorrect, however, in claiming that the ECPA only applies to entities that provide gateway access to the internet. Partsbase offers evidence that it operates a web-based forum in which potential buyers and sellers of airplane parts can communicate their requests to one another. (Tolley Aff. ¶ 5.) Further, Partsbase's web site contains an electronic bulletin board where customers can post requests or offers. (Id.)  This conduct fits the description provided in 18 U.S.C. § 2510(15). See U.S. v. Steiger, 318 F.3d 1039, 1049 (11th Cir. 2003)(citing, as examples of electronic communication service providers, "a phone company, Internet Service Provider ..., or electronic bulletin board system"); see also Sherman & Co. v. Salton Maxim Housewares, Inc., 94 F. Supp. 2d 817 (E.D. Mich. 2000)(holding, in dicta, that a company's computer network, containing information about vendors and products, qualified as a facility through which an electronic communication service was provided).  Thus, ILS's supplemental motion for partial summary judgment is DENIED.


## VII. Conclusion

For the foregoing reasons, Partsbase's motion in limine to

exclude the Slater damage report is DENIED without prejudice. Partsbase's motion in limine to exclude ILS records is GRANTED as to the aforementioned "Category 2" documents and DENIED in all other respects. Partsbase's motion to exclude certain references to the 1998 incident is GRANTED. ILS's motion to strike Partsbase's summary judgment evidence is DENIED.

ILS's motion to dismiss Partsbase's counterclaims is GRANTED on Partsbase's claims for trespass, inequitable conduct, and violation of the TCPA. Partsbase's motion for partial summary judgment on ILS's damages claims for lost profits is DENIED. Partsbase's motion for partial summary judgment dismissing Count III (trade secrets) is DENIED, and Partsbase's motion for partial summary judgment dismissing Count IV (ECPA) is also DENIED. Partsbase's "Motion for Partial Summary Judgment Due to Statute of Limitations and 'Non-Customers'" is DENIED on Counts I and IV, GRANTED on Counts II-III as to the nine (9) named customers, and DENIED as to Counts II-III in all other respects. ILS's motion for partial summary judgment is DENIED as to Counts I-IV of ILS' amended complaint; ILS's motion is DENIED as moot as to Partsbase's counterclaims for trespass, inequitable conduct, and violation of the TCPA and DENIED on the remaining counterclaims. Partsbase's "motion concerning the legal status of (a) the ILS supplier directory, and (b) the ILS database accessible to 5,000 customers and their employees," construed as a supplemental motion for summary judgment on Count III (trade secrets) of the amended complaint, is GRANTED on any claims arising from the alleged

misappropriation of the ILS supplier directory and DENIED in all
other respects.   ILS's supplemental motion for summary judgment on
Count IX of Partsbase's amended counterclaims is DENIED.

So ORDERED this **2d** day of September 2005.

_____
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE

56

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 172 in case 2:02-CV-02695 was distributed by fax, mail, or direct printing on September 9, 2005 to the parties listed.

---

Travis M. Perry
HAYNES & BOONE LLP
901 Main St.
Ste. 3100
Dallas, TX 75202

Peter D Marketos
HAYNES & BOONE LLP
901 Main St
Ste. 3100
Dallas, TX 75202

W. Paul Hankins
HAYNES AND BOONE, LLP
901 Main Street
Ste. 3100
Dallas, TX 75202--378

Brian S. Faughnan
ARMSTRONG ALLEN, PLLC
80 Monroe Avenue
Ste. 700
Memphis, TN 38103--246

Donald C. Templin
HAYNES AND BOONE, LLP
901 Main Street
Ste. 3100
Dallas, TX 75202--378

Randall D. Noel
ARMSTRONG ALLEN, PLLC
80 Monroe Avenue
Ste. 700
Memphis, TN 38103--246

John McQuiston
STOKES BARTHOLOMEW EVANS & PETREE, P.A.
1000 Ridgeway Loop Rd.
Ste. 200
Memphis, TN 38120

Honorable Samuel Mays
US DISTRICT COURT